Marcus A. Helt (Texas Bar #24052187)
Jane A. Gerber (Texas Bar #24092416)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel: (214) 210-2821 / Fax: (972) 528-5765
Email: mhelt@mwe.com
Email: jagerber@mwe.com

*PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER WASTE SOLUTIONS, LP, *et al.*,[1] | Case No. 21-42423 (●) |
| Debtor. | |

**DECLARATION OF JAMES CALANDRA
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, James Calandra, hereby declare under penalty of perjury:

1.  My name is James Calandra. I am over the age of twenty-one (21) years, am competent to make this declaration, and have personal knowledge of the facts as stated in this declaration.

2.  I am a Managing Director of CRS Capstone Partners LLC ("Capstone"), with offices at 500 N. Akard Street, Suite 2350, Dallas, TX 75201. I am the proposed Chief Restructuring Officer of Red River Waste Solutions, LP ("Red River," the "Company" or the "Debtor"), and Capstone is the proposed financial advisor for the Debtor. On October 14, 2021

---

[1] The last four digits of the Debtor's taxpayer identification number are 8719. The Debtor's principal office is located at 4004 East Hwy, 290 West, Dripping Springs, Texas 78620.

(the "Petition Date"), Red River filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. I submit this declaration (the "Declaration") in support of the Debtor's petition and various contemporaneously filed pleadings and requests for relief in the form of motions (each a "First Day Motion" and collectively the "First Day Motions"), as well as to assist this Court and other interested parties in understanding the circumstances that compelled this chapter 11 case (the "Chapter 11 Case").

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtor and its industry. References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**I. Qualifications**

5. I received a bachelor's degree in accountancy from Bentley University and a master's of science degree in accountancy from McCallum Graduate School of Business at Bentley University. I am a Certified Public Accountant and a Certified Turnaround Professional.

6. Prior to joining Capstone in 2015, I was managing member and co-founder of Birch Hill Partners, a management consulting firm focused on turnaround management and business performance improvement. I was previously a Managing Director at Argus Management Corporation, a regional management consulting firm in New England, and a Senior Manager with Ernst & Young LLP. While at Ernst & Young, I spent several years in Germany and was involved in capital markets and transaction advisory services with Ernst & Young GmbH.

7. Over the course of my career, I have advised more than 50 companies through significant strategic transitions involving public and private middle market companies in varying

situations, including waste management, healthcare, technology, manufacturing, retail, and hospitality.

8. In addition to working with the Debtor in this Chapter 11 Case, my restructuring and financial advisory engagements have included representations of debtors in the following recent chapter 11 cases: Provision Proton Therapy Centers (Nashville, filed December 2020), Latex Foam International (Bridgeport CT, filed August 2019), and SEGA Biofuels (Brunswick GA, filed March 2018).

9. I have advised the Debtor on, among other things, debtor in possession financing. I have participated in negotiations among the Debtor and various creditor constituencies, as well as between the Debtor and potential lenders and investors. I have participated in numerous discussions with the Debtor's management team regarding the Debtor's need for, and available sources of debtor in possession financing.

II. **Information Concerning the Nature of the Debtor's Business and Statement of the Circumstances Leading to the Debtor's Chapter 11 Case**

10. Contemporaneously with the filing of this Declaration, the Debtor submitted the *Statement of Background Information* (the "Statement"), which provides a detailed explanation of the events leading up the filing of the Chapter 11 Case. I adopt and incorporate by reference the facts set forth in the Statement. In addition, based upon Capstone's review of the Debtor's financials, I have determined that losses sustained by the Debtor as a result of the impact of the COVID-19 pandemic, combined with a high degree of leverage, caused a significant deterioration of its financial condition and led to this Chapter 11 Case.

11. Jim Smith, serves as the Chief Executive Officer of Debtor Red River Waste Solutions, LP. Red River Service Corporation holds a 51.15% ownership interest in Debtor Red River Waste Solutions, LP. The other entities owning the remaining interests of the Debtor (and their respective interests) are: Ironwood Mezzanine Fund III-A (4.45%); Ironwood Mezzanine Fund III (3.99%); Patriot Capital III SBIC, LP (5.86%); Patriot Capital III, LP (0.31%); Weldon

James Smith 2012 Trust (11.08%); Jaime Shiloh Jones 2012 Trust (11.08%); Kylie Ann Clayborne 2012 Trust (11.08%); and Red River Waste Solutions, GP, LLC (1%).

12. As of September 30, 2021, Red River had approximately $35.0 million in total debt funded obligations, consisting of (a) approximately $5.0 million in aggregate principal and interest amounts outstanding under a prepetition revolving facility (the "Revolving Facility"), and (b) approximately $29.6 million in aggregate principal and interest amounts outstanding under a term loan facility (the "Term Loan Facility"). The following table summarizes Red River's prepetition capital structure.[2]

| Funded Debt | Maturity | Outstanding Principal Amount as of October 11, 2021 |
|---|---|---|
| Secured Debt | | |
| Revolving Facility | April 1, 2025 | $4.8 million |
| Term Loan Facility | April 1, 2025 | $26.3 million |
| **Total Secured and Funded Debt** | | **$31.1 million** |

13. The Revolving Facility and the Term Loan Facility are each provided under that certain Credit Agreement, dated as of April 1, 2020 (as amended from time to time and with all supplements and exhibits thereto, the "Prepetition Credit Agreement"), by and between Red River Waste Solutions, LP, as borrower, Red River Service Corporation, as guarantor, and MUFG Union Bank, N.A. ("Union Bank"), as administrative and collateral agent, among others. The Prepetition Credit Agreement provides that the obligations arising thereunder are to be secured by first priority liens on assets of Debtor Red River Waste Solutions, LP and non-debtor Red River Waste Solutions, GP, subject to customary exceptions and exclusions.

14. Absent the filing of this Chapter 11 Case and the forthcoming restructuring and/or sale, it appears that the Debtor's business will continue to deteriorate.

---

[2] Union Bank (defined below) asserts additional fees and expenses are due, as well.

### III. First Day Motions

15. As noted in the Statement, the Debtor intends to file several First Day Motions. Approval of each of the First Day Motions is important, and in some cases critical, to the Debtor's emergence from bankruptcy. I have reviewed each of the First Day Motions (including the attached exhibits) and can attest to the veracity of the facts set forth therein. Additionally, I believe the relief sought in each First Day Motion is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption to its business and to prevent a material loss of productivity or value. Factual information in support of the First Day Motions is provided below, in the Statement, and in the First Day Motions filed concurrently herewith.

#### A. *Request for Emergency Consideration of Certain First Day Matters*

16. The Debtor, through the daily efforts of its approximately 200 employees provides critical waste removal services in Texas, Indiana, Alabama, Tennessee and Kentucky. It has filed this Chapter 11 Case as a major step towards reorganizing its business operations, including sustaining the services it provides to its customers. In order to protect the business and its employees, its most critical resource, it seeks emergency relief from the Court on these First Day Motions.

#### B. *Notice of Designation as Complex Chapter 11 Bankruptcy Case*

17. The Debtor, its management, and its advisors believe the Debtor's Chapter 11 Case qualifies as a complex chapter 11 case pursuant to this Court's *Procedures for Complex Chapter 11 Cases*, and requests the Court consider this request on an emergency basis.

#### C. *Debtor's Emergency Motion for Entry of an Order Extending the Time to File Schedule and Statements*

18. In its preparation for this Chapter 11 Case, the Debtor, its management, and its advisors have spent significant time and resources (i) negotiating with its secured and unsecured creditors; (ii) researching, investigating and negotiating postpetition financing; and (iii) preparing this case to ensure a smooth transition into Chapter 11, so that it can maximize value for the estate, creditors and parties in interest. The Debtor has a limited number of employees with detailed

knowledge of the Debtor's financial affairs and the skill to perform the necessary review and analysis of the Debtor's financial records, and each of these employees provides additional critical functions to the Debtor's operations.

19. In light of the Debtor's limited resources and the prior restraints hindering it from preparing its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively the "<u>Schedules and Statements</u>"), it requests additional time to prepare and file its Schedules and Statements. An extension will not harm creditors or other parties in interest because, even under the proposed extended deadline, the Debtor will file the Schedules and Statements in advance of the meeting of creditors and any deadline for filing proofs of claim in this case.

D. ***Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Continue its Insurance Policies and Honor all Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and (C) Honor the terms of Related Payment Plans and Pay Premiums Thereunder, and (II) Granting Related Relief***

20. As for any debtor, it is critical that this Debtor maintain adequate insurance coverage during this Chapter 11 Case. These insurance policies are essential to the preservation of the value of the Debtor's business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, credit agreements, and contracts that govern the Debtor's commercial activities, including the requirement by the United States Trustee for the Northern District of Texas, that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

E. ***Debtor's Emergency Motion for Entry of an Order (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services, (III) Approving the***

*Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*

21. In connection with the operation of its business and management of its properties, the Debtor obtains utilities from more than two dozen providers. With the Court's permission, the Debtor intends to pay postpetition obligations owed to these utility providers in a timely manner. Even so, the Debtor proposes establishing an adequate assurance deposit of approximately $17,770.00 for its utility providers and establishing procedures that permit these providers to object to this adequate assurance. The Debtor submits that its proposed procedures are proposed in good faith and will protect it against the termination or alteration of utility services after the Petition Date.

F. *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*

22. The Debtor employs approximately 200 employees, and is dependent on the expertise, continued enthusiasm and service of these individuals for the success of its operations. The Debtor offers competitive compensation including: wages, reimbursements and benefits such as medical, dental, vision and prescription drug coverage, life insurance, accidental death and dismemberment insurance, short- and long-term disability insurance, workers' compensation insurance, and a 401(k) savings plan. In order to protect its employees and the Debtor's operations and value, it requests the Court's relief to fulfil its prepetition and postpetition obligations.

G. *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief*

23. In the ordinary course of its business, the Debtor collects, withholds, and incurs certain sales, use, franchise, property taxes and business license and permit fees, and then remits these funds to various state and local governments, including taxing and licensing authorities. The Debtor requests the Court's relief to continue these practices in the ordinary course of busines,

including paying any amounts that were accrued or incurred prepetition, but were not paid prepetition.

H. *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Continue to (A) Operate its Cash Management System, and (B) Use Existing Business Forms and Records, and (II) Granting Related Relief*

24. The Debtor uses a cash management system in the ordinary course of business to collect, transfer, and distribute funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting. This system allows the Debtor to control funds, ensure cash availability for its operations, and reduce administrative costs. In order to minimize the disruption caused by this chapter 11 case and to maximize the value of the Debtor's estate, the Debtor requests authority, but not direction, to continue to utilize its existing system.

I. *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Redact Certain Personal Identification Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtor's Chapter 11 Case, and (III) Granting Related Relief*

25. Pursuant to the Debtor's motion, the Debtor requests authority to redact the addresses of individuals, including the Debtor's employees and former employees, from the Creditor Matrix and any other documents filed in the chapter 11 case. Although transparency is important, the Debtor has proposed appropriate procedures to protect these individuals and ensure parties, as needed, receive unredacted information. In addition, the Debtor's motion requests authority to serve notice of commencement of the chapter 11 case to all parties on the Creditor Matrix to advise them of the commencement of the case and the meeting of creditors under section 341 of the Bankruptcy Code.

J. *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 105, 361, 362, 363, and 507 of the Bankruptcy Code; and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b)*

26. Pursuant to the Debtor's motion, the Debtor requests entry of an interim order (i) authorizing the Debtor to use cash collateral, and granting adequate protection to the certain Prepetition Secured Parties, as defined in the motion, on the terms and conditions set forth in the interim order. The Debtor also requests a final hearing to consider the relief requested in the motion.

27. The proposed cash collateral the Debtor seeks to use consists of proceeds of products of prepetition collateral or cash subject to the Prepetition Secured Parties' rights of setoff, if any. The Debtor requires authorization to use cash collateral to maintain its existing cash management system. Without this authorization, the Debtor will not be able to access its cash management system and provide sufficient working capital to carry on the operation of its business. This outcome would have disastrous effects on its business causing immediate and irreparable harm to the Debtor, its estate, and its creditors.

28. The Debtor seeks authority to use cash collateral until such time as the Court holds a final hearing on the motion. The Debtor will fund operations in accordance with its budget (as may be revised from time to time at the discretion of the Debtor), which sets forth all projected cash receipts and cash disbursements during the 13-week period. I worked with the Debtor to formulate the budget, which includes reasonable and foreseeable expenses to be incurred, and costs of administering this Chapter 11 Case during the applicable period.

29. To protect the Prepetition Secured Parties to the extent of any aggregate diminution in value of the Prepetition Collateral resulting from the use of cash collateral, the Debtor proposes to provide various forms of adequate protection detailed in the proposed interim order to the motion.

30. I believe the proposed adequate protection provides the Prepetition Secured Parties with sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral during this chapter 11 case. I believe that the relief requested in the cash collateral motion is in the best interests of the Debtor, its estate, and all parties in interest and should be approved.

K. ***Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Superpriority, Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief***

31. As discussed above, the Debtor entered into the Prepetition Credit Agreement in April 2020. Following several covenant breaches, the Debtor and Union Bank entered into several amendments to the Credit Agreement: the First Amendment was signed on September 30, 2020; the Second Amendment was signed on December 1, 2020; and the Third Amendment was signed on March 9, 2021. On July 21, 2021, the Debtor received a written notice of default from Union Bank. Following receipt of this letter, the Debtor entered into discussions with Union Bank, which included discussing (a) a forbearance, (b) potential sale(s) of the Debtor's business assets, and (c) the engagement of a chief restructuring officer. At that time, the Debtor was in negotiations with two potential buyers for its business assets. The potential buyers were identified in a sale process that was conducted by the Debtor, with the assistance of an investment banker, in 2020. That sale process involved the solicitation of interest from numerous market participants and resulted in several proposals, however, buyer interest declined through the due diligence process and, consequently, transaction values also declined. In July 2021, the Debtor reached out to Capstone and legal counsel to advise it through these challenging events.

32. The Debtor, with the assistance of its advisors, also began exploring potential relief under the Bankruptcy Code and investigating potential debtor in possession financing options. Capstone prepared an overview of the Debtor's operations and financial needs, which was distributed, on a confidential basis, with approximately 15 potential debtor in possession ("DIP") lenders. Nine interested parties executed non-disclosure agreements and were provided access to a data room, which contained information about the Debtor's business operations, financial performance, and assets. The Debtor received four DIP loan term sheets. Of the loan term sheets received, no third-party lender was willing to provide postpetition DIP financing on an unsecured, pari passu, or on a junior-lien basis to Union Bank.

33. Given the immediate need for funding to meet the Debtor's operational needs, the Debtor selected Weldon Smith (the "DIP Lender") to provide DIP financing. The DIP Lender will provide the Debtor with a DIP facility (the "DIP Facility") in the principal amount of up to $500,000.00, all of which will be new credit. This DIP loan will bear interest at the rate of 6% computed on an actual / 360 basis, payable monthly in arrears and will mature six (6) months after the closing of the DIP Facility.

34. The Debtor requires immediate access to financing under the DIP Facility to ensure it is able to continue operating during this Chapter 11 Case and preserve the value of its estate for the benefit of all parties in interest, especially in the crucial early days of this case. Without immediate postpetition financing, the Debtor will be unable to pay wages to its employees, pay vendors for equipment and services, meet working capital and business operating needs, preserve and maximize the value of its estate, and administer this Chapter 11 Case, causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders. Otherwise customers may seek alternative products and services, and vendors and suppliers may refuse to do business with the Debtor.

35. The proposed DIP Facility is a key component to ensure the Debtor is able to continue its operations during this Chapter 11 Case, and is the product of good faith negotiations conducted at arm's-length between the Debtor's advisors and the DIP Lender's advisors. Without these funds, the Debtor has insufficient funds to continue paying its debts as they come due and cover the projected costs of this Chapter 11 Case. I believe that the terms of the DIP Facility are fair, reasonable and appropriate under the circumstances and are in accordance with current market terms and further, that the DIP Facility is necessary to avoid irreparable harm during the course of this Chapter 11 Case. Moreover, this proposed DIP Facility is critical to the Debtor's post-petition operations and without it, the Debtor will not be able to maximize value for the estate, creditors and parties in interest.

36. This proposed DIP Facility is critical to the Debtor's post-petition operations and without it, the Debtor will not be able to maximize value for the estate, creditors and parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 14, 2021

*/s/ James Calandra*
James Calandra
Managing Director
CRS Capstone Partners LLC