Marcus A. Helt (Texas Bar #24052187)
Jane A. Gerber (Texas Bar #24092416)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel:      (214) 210-2821 / Fax: (972) 528-5765
Email:   mhelt@mwe.com
Email:   jagerber@mwe.com

*PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| RED RIVER WASTE SOLUTIONS, LP,[1] | ) | Case No. 21-43423 (●) |
|  | ) |  |
| Debtor. | ) | (Expedited Consideration Requested) |
|  | ) |  |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Red River Waste Solutions, LP, as the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or "Red River")[2] hereby moves (this "Motion"):[3]

---

[1]  The last four digits of the Debtor's taxpayer identification number are 8719.  The Debtor's principal office is located at 4004 East Hwy, 290 West, Dripping Springs, Texas 78620.

[2]  A detailed description of the Debtor and its businesses, and the facts and circumstances supporting this Motion are set forth in the *Declaration of James Calandra in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration").

[3]  Capitalized terms used but not yet defined herein have the meanings ascribed to such terms later in this Motion, the Interim Order (defined below) or in the First Day Declaration, as applicable.

**Introduction**

1.      By this Motion, the Debtor seeks to obtain senior secured postpetition debtor in possession financing facility (the "DIP Facility") from Weldon Smith (the "DIP Lender", and together with the Debtor, the "DIP Loan Parties") to provide financing to reorganize the Debtor.

2.      As described in the First Day Declaration, the Debtor negotiated with the DIP Lender in anticipation of funding this case.  To finance this chapter 11 case (the "Chapter 11 Case" or the "Case"), the DIP Lender will provide the Debtor with a DIP Facility sufficient and necessary to continue its ongoing operations and position the Debtor for successful reorganization, save jobs, and ensure that the Debtor's key customers and vendors continue to have a viable go-forward business partner.

3.      The DIP Facility will provide the Debtor with sufficient liquidity to fund its business operations and administrative expenses at the outset of this Chapter 11 Case.  If approved, the Debtor will use the proceeds of the DIP Facility to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of this Chapter 11 Case, all in accordance with a budget agreed to by the Debtor and the DIP Lender (as may be modified, supplemented, or amended, from time-to-time, the "Approved Budget") attached as **Exhibit 2** to the form of proposed interim order attached hereto as **Exhibit A** (the "Interim Order").  A copy of the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral and Post-Petition Financing is annexed hereto as **Exhibit B**.

4.      As set forth in the First Day Declaration, the Debtor and its estate would suffer immediate and irreparable harm if it was denied the financing needed to sustain on-going business operations during the critical first weeks of the case.  The DIP Facility ensures that the Debtor will continue to operate uninterrupted in this Chapter 11 Case.  Further, as set forth in the First Day

Declaration, the terms of the DIP Facility are reasonable under the circumstances, and were the product of good faith, arm's length negotiations.

5.     Thus, for the reasons set forth herein and, in the First Day Declaration, the Debtor believes that approval of the DIP Facility will maximize the value of the Debtor's estate for the benefit of all stakeholders and is an exercise of sound business judgment.  Accordingly, the Debtor respectfully requests that the Court approve the relief requested herein, and enter an interim order substantially in the form of the Interim Order attached hereto as **Exhibit A** and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

### Jurisdiction and Venue

6.     The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S. C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S. C. § 157(b).  The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

7.     Venue is proper pursuant to 28 U.S. C. §§ 1408 and 1409.

8.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S. C.  §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rule 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

### Background

9.     Contemporaneously with the filing of this Motion, the Debtor filed its *Statement of Background Information* and the First Day Motion, describing the facts and circumstances of this case and supporting this Motion, which are incorporated by reference herein.

10.     The Debtor is operating its business and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in this chapter 11 case, and no committees have been appointed or designated.

## **Relief Requested**

11.     By this motion, the Debtor seeks entry of the Interim Order, and subsequently, the Final Order:

    a.     authorization for Red River Waste Solutions, LP to the obtain the DIP Facility from the DIP Lender consisting of a superpriority debtor-in-possession credit facility pursuant to the terms and conditions of that certain debtor-in-possession financing term sheet among the Debtor and DIP Lender, such term sheet attached as **Exhibit 1 to the Interim Order** (as may be amended restated, supplemented, waived the "Term Sheet") and which shall consist of a superpriority priming term loan facility with an aggregate principal amount of up to $500,000 from the DIP Lender;

    b.     authorization for the Debtor and DIP Lender to execute and enter into the Term Sheet and any other agreements, instruments, pledge agreements, guarantees, security agreements, control agreements, notes and other documents reasonably required by the DIP Lender (collectively, and together with the Orders, the "DIP Financing Documents") and all obligations and indebtedness of any of the Debtor to the DIP Lender under the DIP Financing Documents (collectively, the "DIP Obligations") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Financing Documents, including, but not limited to, granting or perfecting liens or security interests by the Debtor in favor of and for the benefit of the DIP Lender on account of the DIP Facility;

    c.     the authority for the DIP Loan Parties to use the proceeds of the DIP Facility as expressly provided in the DIP Financing Documents and solely in accordance with the Approved Budget (defined below);

    d.     authorization for the Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Financing Documents as such become earned, due and payable, including, but not limited to, the DIP Lender's transaction expenses;

    e.     the granting to the DIP Lender of allowed superpriority claims, subject to the Carve Out (as defined below), pursuant to section 364(c)(1) of the

4

Bankruptcy Code payable from and having recourse to the collateral set forth on **Exhibit B** to **Exhibit 1**, attached to the Interim Order (the "DIP Collateral");

f.      the granting to the DIP Lender of liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the DIP Collateral, subject to the Carve Out;

g.      modification of the automatic stay of Bankruptcy Code section 362 (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents, including the Interim Order;

h.      a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness of the Interim Order; and,

i.      the scheduling of an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim Order;

j.      scheduling a final hearing (the "Final Hearing") to be held within 25 days of the entry of the Interim Order to consider final approval of the DIP Facility pursuant to a proposed final order; and

k.      granting such other and further relief as is just and proper.

## Concise Statement Pursuant to Bankruptcy Rule 4001(b)

**I.      Concise Statement regarding the DIP Facility.[4]**

12.     The below chart contains a summary of the material terms of the proposed DIP Loan, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).[5]

---

[4]   Any summary of the terms of the Term Sheet or Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Term Sheet or Interim Order, as applicable. To the extent the Motion is inconsistent with the Interim Order or Term Sheet, as applicable, the relevant document shall control. The Debtor reserves the right to supplement the statements made pursuant to Bankruptcy Rule 4001.

[5]   Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the Term Sheet or the Interim Order, as applicable.

DM_US 182783900-4.114930.0011

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Red River Waste Solutions, LP<br><br>*See* Term Sheet at 1 |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Weldon Smith<br><br>*See* Term Sheet at 1. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Facility matures six (6) months from closing.<br><br>*See* Term Sheet at Exhibit 1 to the Interim Order. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | Up to five hundred thousand dollars ($500,000) fully funded upon satisfaction of all conditions precedent.<br><br>*See* Term Sheet at Exhibit A. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Closing will be subject to the closing conditions set forth in the definitive agreements that shall include, without limitation, the following conditions precedent:<br>i.  Debtor and Lender executing definitive agreements for the DIP Facility on terms and conditions acceptable to Lender in Lender's sole and absolute discretion;<br>ii.  The Bankruptcy Court shall have entered an order approving the DIP Facility and granting the Lender an administrative expense consistent with the terms on the attached <u>Exhibit A</u> and a senior lien on the collateral described on the attached <u>Exhibit B</u>;<br>iii.  If any other approvals or consents are needed to effectuate the proposed transaction, all such approvals and consents have been obtained;<br>iv.  Closing is predicated on Lender and Debtor' mutual satisfaction with the definitive documentation; and<br>v.  Closing on any single agreement is predicated on the closing of all definitive agreements.<br>*See* Term Sheet at ¶6, Exhibit A, and Exhibit B. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Cash interest shall be computed on an actual / 360 basis, payable monthly in arears at 6% per annum.<br><br>Default rate equal to applicable Interest Rate plus four percent (4.0%)<br><br>*See* Term Sheet at Exhibit A. |
| **Use of DIP Financing Facility** Bankruptcy Rule 4001(b)(l)(B)(ii) | Use of proceeds of the DIP Facility based on a mutually agreed upon budget for the following purposes:<br>i.      Working capital, liquidity and general corporate purposes; and |

6

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | ii.     Administrative and professional fees<br><br>*See* Term Sheet at Exhibit A. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>**Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | Upon closing, Lender shall be provided with an operating budget with the projected financial operations of the Debtor in a form acceptable to Lender in Lender's sole discretion.<br><br>*Approved Budget.* The Approved Budget is attached as Exhibit 2 to the Interim Order.<br><br>*See* Interim Order, Exhibit 2.<br><br>The Debtor shall provide the DIP Lender with a variance report reflecting the actual cash Closing through November 7, 2021 (the "Budget Period"), within three (3) business days after the end of each such one-week period, and showing the percentage variance of actual receipts and disbursements from those reflected in the Approved Budget for such periods receipts and disbursements for (a) each one (1) week period and (b) the period from<br><br>*See* Interim Order ¶ 9. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Events of Default include, without limitation: (i) failure to make all required payments, (ii) material non-compliance with the terms and conditions set forth in the DIP Facility Documentation and (iii) the occurrence of one or more material events that have an adverse effect on the Debtor's financial position. Events of default also include:<br><br>(a)    Breach of any payment or reporting obligation under the DIP Facility or this Interim Order;<br><br>(b)    Entry of any order, other than this Interim Order, materially altering, staying, or otherwise modifying the terms of the DIP Facility set forth in the Term Sheet;<br><br>(c)    Filing by Debtor of any pleading pursuing the conversion to Chapter 7 or dismissal of the Chapter 11 Case without the prior written consent of the DIP Lender, which consent may be withheld at DIP Lender's sole discretion;<br><br>(d)    Order of the Bankruptcy Court converting to Chapter 7 or dismissing the Chapter 11 Case, or appointing a Chapter 11 Trustee or examiner that is not previously agreed to in writing by the DIP Lender, which agreement may be withheld at DIP Lender's sole discretion;<br><br>(e)    Entry of any order granting relief from the automatic stay to any party other than the DIP Lender to permit the enforcement of any rights or remedies—including but not limited to foreclosure—against any DIP Collateral (each an "Event of Default" and collectively, "Events of Default").<br><br>*See* Term Sheet at Exhibit A; Interim Order ¶ 12. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtor, and an official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 9. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Debtor agrees that Lender's due diligence costs, including, without limitation, its legal fees (collectively the "**Transaction Expenses**") are the Debtor's responsibility.<br>*See* Term Sheet at ¶ 5, Interim Order ¶ 23. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | By entry of this Interim Order, the Debtor waives its rights under sections 506(c) and 552(b) of the Bankruptcy Code, and the equitable doctrine of marshalling, as to DIP Lender. Such waivers will be binding upon the estate and any subsequently appointed trustee.<br><br>*See* Interim Order ¶ 17. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Debtor has stipulated to: (i) the DIP Lender's terms of financing; (ii) the Debtor reasonably and in good faith believes that the loaned amounts are sufficient to fund projected legitimate and allowable expenses through the Budget Period; and (iii) the Debtor has the requisite power and authority to undertake actions required all as more fully set out in paragraph F.<br><br>*See* Interim Order ¶ F. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including, without limitation, to: (a) permit the Debtor to grant the DIP Liens and Superpriority Claim; (b) permit the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Order and the DIP Facility; and (c) permit the DIP Lender to pursue appropriate remedies provided under the DIP Facility and this Order should an Event of Default occur.<br><br>If the Debtor fails to cure the Event of Default during the Cure Period, or is unsuccessful at disputing the Event of Default during a Default Hearing, then DIP Lender may exercise all rights and remedies against the Debtor and the DIP Collateral in accordance with the DIP Facility and applicable law without further order of this Court.<br><br>*See* Interim Order ¶¶ 13 and 15. |

8

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Waiver or Modification of Nonbankruptcy Lien Perfection Law**<br><br>Rule 4001(c)(1)(B)(vii) | This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without (a) the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction, or (b) taking any other action to validate or perfect the DIP Liens in accordance with applicable non-bankruptcy law. Notwithstanding the foregoing, the DIP Lender is authorized to file any such documents or notices and to take any action otherwise required by applicable non-bankruptcy law to perfect or evidence the existence of perfected liens on the DIP Collateral. The Debtor is authorized and directed to execute and deliver promptly upon demand to DIP Lender all such financing statements, titles, deeds of trust, control agreements, notices, and other documents that the DIP Lender may reasonably request. DIP Lender may, in its sole discretion, file a copy of this Order as a financing statement or as other evidence of the perfection of the DIP Liens in the DIP Collateral with any filing or recording office or with any registry of deeds, titles, or similar office in addition to or in lieu of a financing statement, notice of lien, or other similar instrument.<br><br>*See* Interim Order ¶ 8. |

### The Debtor's Prepetition Capital Structure

13. As of September 30, 2021, Red River had approximately $35.0 million in total debt funded obligations, consisting of (a) approximately $5.0 million in aggregate principal and interest amounts outstanding under a prepetition revolving facility (the "Revolving Facility"), and (b) approximately $29.6 million in aggregate principal and interest amounts outstanding under a term loan facility (the "Term Loan Facility"). The following table summarizes Red River's prepetition capital structure.[6]

| Funded Debt | Maturity | Outstanding Principal Amount as of October 11, 2021 |
|---|---|---|
| Secured Debt | | |
| Revolving Facility | April 1, 2025 | $4.8 million |
| Term Loan Facility | April 1, 2025 | $26.3 million |
| Total Secured and Funded Debt | | $31.1 million |

---

[6] Union Bank asserts additional fees and expenses are due, as well.

14. The Revolving Facility and the Term Loan Facility are each provided under that certain Credit Agreement, dated as of April 1, 2020 (as amended from time to time and with all supplements and exhibits thereto, the "<u>Prepetition Credit Agreement</u>"), by and between Red River Waste Solutions, LP, as borrower, Red River Service Corporation, as guarantor, and MUFG Union Bank, N.A. ("<u>Union Bank</u>"), as administrative and collateral agent, among others. The Prepetition Credit Agreement provides that the obligations arising thereunder are to be secured by first priority liens on assets of Debtor Red River Waste Solutions, LP and non-debtor Red River Waste Solutions, GP, subject to customary exceptions and exclusions.

**A. Union Bank's Security Interests.**

15. In the months before the Petition Date, Red River determined that certain of the liens securing the Prepetition Credit Facility were not properly perfected as had been required. Specifically, the certificates of title for multiple vehicles and other equipment have not been properly perfected. The Debtor challenges Union Bank's interest in the DIP Collateral.

<strong><u>The DIP Facility</u></strong>

**I. The Debtor's Need for Access to Financing.**

16. As described in the First Day Declaration, the Debtor requires immediate access to financing under the DIP Facility to ensure it is able to continue operating during this Chapter 11 Case and preserve the value of its estate for the benefit of all parties in interest. Without immediate postpetition financing, the Debtor will be unable to pay wages to its employees, pay vendors for equipment and services, meet working capital and business operating needs, preserve and maximize the value of its estate, and administer this Chapter 11 Case, causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders. Otherwise

customers may seek alternative products and services, and vendors and suppliers may refuse to do business with the Debtor.

17. As set forth in the Approved Budget, to ensure such liquidity, the Debtor seeks authorization to obtain $500,000.00 from the DIP Facility. The Debtor believes the DIP Facility is essential to preserve and maximize the value of it estate, and responsibly administer this Chapter 11 Case in the crucial early months of this case.

**A. Alternative Sources of Financing Are Not Available on Better Terms.**

18. The Debtor engaged CRS Capstone Partners LLC ("Capstone") in July 2021 as a financial advisor to assist the company and exploring financing options to address the Debtor's liquidity constraints. To that end, Capstone prepared an overview of the Debtor's operations and financial needs, which was distributed, on a confidential basis, with approximately 15 potential debtor in possession ("DIP") lenders. Nine interested parties executed non-disclosure agreements and were provided access to a data room, which contained information about the Debtor's business operations, financial performance, and assets. The Debtor received four DIP loan term sheets.

19. The Debtor ultimately determined that the DIP Facility was the best financing alternative available under the circumstances because it was able to provide competitive and sufficient financing to meet the Debtor's proposed liquidity needs early in this Case.

20. The proposed DIP Facility is a key component to ensure the Debtor is able to continue its operations during this Chapter 11 Case, and is the product of good faith negotiations conducted at arm's-length between the Debtor's advisors and the DIP Lender's advisors. The Debtor would further demonstrate that the terms of the DIP Facility are fair, reasonable and appropriate under the circumstances and are in accordance with current market terms and further, that the DIP Facility is fair, reasonable, an exercise of sound business judgment, and necessary to avoid irreparable harm during the course of this Chapter 11 Case.

**Basis for Relief**

I.      **The Debtor Should Be Authorized to Obtain Postpetition Financing Through the DIP Financing Documents.**

      A.      **Entry into the DIP Financing Documents Is an Exercise of the Debtor's Sound Business Judgment.**

21.     The Court should authorize the Debtor to enter into the DIP Financing Documents, and obtain access to the DIP Facility.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S. D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); In *re L. A. Dodgers LLC*, 457 B. R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B. R. 34, 40 (Bankr. S. D. N. Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

22.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also *In re Curlew Valley Assocs.*, 14 B. R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

23.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W. D. Mo.  2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.  7 (W. D.  Mich.  1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc*., the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization***.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at \*4 (Bankr. S. D. N. Y. July 6, 2009) (emphasis added).

24.     The Debtor's determination to move forward with the DIP Facility is an exercise of its sound business judgment.  The DIP Facility will allow the Debtor to:  (a) fund capital expenditures that are essential to the Debtor's continuation as a going concern; (b) provide the liquidity necessary to continue favorable trade terms with vendors and to reassure other stakeholders; (c) fund payroll obligations; (d) fund the administrative cost of this Chapter 11 Case;

DM_US 182783900-4.114930.0011

and (e) provide a path to emergence by allowing the Debtor to investigate and implement the appropriate restructuring plan. The Debtor negotiated the DIP Facility and other DIP Financing Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtor believes that it has obtained the best financing available under the circumstances.

> **B.     The Debtor Should Be Authorized to Grant Liens and Superpriority Claims.**

25.     The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Financing Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtor proposes to provide to the DIP Lender postpetition security interest in and liens on the DIP Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

26.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the First Day Declaration, and were a necessary feature here to provide security for the proposed financing. Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See, e. g., In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N. D. Tex. Nov. 27, 2020) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Taco Bueno Restaurants, Inc*., No. 18-33678 (SGJ) (Bankr. N. D. Tex. Nov. 30, 2018) (same).

27.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re*

*Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E. D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B. R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S. D. N. Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E. D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

    28.    As described above and as set forth in the First Day Declaration, no third-party lender was willing to provide postpetition DIP financing on an unsecured, pari passu, or on a junior-lien basis to Union Bank. *See* First Day Decl. ¶ 32.

    29.    Absent the DIP Facility, which will provide assurances that the Debtor will have sufficient liquidity to administer this Chapter 11 Case, the value of the Debtor's estate would be significantly impaired to the detriment of all stakeholders. *See* First Day Decl. ¶¶ 34-35. Without postpetition financing, the Debtor lacks sufficient funds to operate its enterprise, continue paying its debts as they come due, and cover the projected costs of this Chapter 11 Case. *See* First Day Decl. ¶ 34. Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility, as set forth in the DIP Financing Documents, are reasonable as more fully set forth above and in the First Day Declaration. For all these reasons, the Debtor submits that it has met the standard for obtaining postpetition financing.

30.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."    As described above, the Debtor is unable to obtain unsecured credit.    Therefore, approving a superpriority claim in favor of the DIP Lender is reasonable and appropriate.

31.     Here, because Union Bank does not have a perfected interest in the DIP Collateral, its interests are adequately protected.    Section 544 of the Bankruptcy Code provides the trustee with the status of a hypothetical lien creditor, allowing the trustee to avoid a security interest that is unperfected as of the date of the commencement of the case.    11 U.S.C. § 544(a); *In re Roy*, 12 F.3d 1099 (5th Cir. 1993).

32.     "The determination of whether a creditor has properly perfected its security interest is also governed by state law." *Stanton v. Texas Drug Co*. (*In re Stanton*), 254 B.R. 357, 361–62 (Bankr.E.D.Tex.2000).    In Texas, a security interest in a motor vehicle is properly perfected by recording the security interest on the vehicle's certificate of title. TEX. TRANSP. CODE ANN § 501.111(a) (West 2021).    The lienholder is entitled to retain the original certificate of title until the loan is satisfied. See TEX. TRANSP. CODE ANN § 501.027 (West 2021); *Dota v. First National Bank of El Campo* (*In re Dota*), 288 B.R. 448, 460 (Bankr.S.D.Tex.2003).    A trustee may avoid an unperfected lien on a vehicle pursuant to the strong arm powers under section 544 of the Bankruptcy Code. *see also In re Hancock*, 126 B.R. 270, 272–73 (Bankr.E.D.Tex.1991)

(discussing that trustee, as lien creditor, could avoid an unperfected lien on a vehicle under the strong arm powers of 11 U.S.C. § 544(a)(1)).

33. As discussed above, the certificates of title for multiple vehicles and other equipment have not been recorded and, therefore, are not properly perfected under Texas law. The Debtor challenges any claim to a security interest by Union Bank in the DIP Collateral. Because Union Bank does not have a perfected interest in the DIP Collateral, its interests are adequately protected and are not being primed. Therefore, the relief requested pursuant to section 364(c) of the Bankruptcy Code is appropriate.

## C. No Comparable Alternative to the DIP Facility is Reasonably Available on More Favorable Overall Terms.

34. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co*., Inc., 789 F. 2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc*., 137 B. R. 897, 900 (Bankr. N. D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B. R. 107, 113 (Bankr. N. D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc*., 99 B. R. 117, 120 n. 4 (N. D. Ga. 1989); *see also In re Snowshoe Co*., 789 F. 2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc*., 15 B. R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B. R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

17

35. As noted above, the Debtor does not believe that a more favorable alternative DIP financing is reasonably available. The DIP Facility provides the Debtor with the liquidity it needs at the lowest cost available while simultaneously placing the Debtor on an optimal path for a successful restructuring. Therefore, the Debtor submits that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

## II. The DIP Lender Should Be Deemed A Good-Faith Lender Under Section 364(e).

36. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

37. As explained herein, in the First Day Declaration, the DIP Financing Documents are the result of: (a) the Debtor' reasonable and informed determination that the DIP Lender provided the best postpetition financing alternative available under the circumstances, and (b) extended arm's length, good-faith negotiations between the Debtor and the DIP Lender. The Debtor submits that the terms and conditions of the DIP Financing Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein. Accordingly, the Court

should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

### III. The Automatic Stay Should Be Modified on a Limited Basis.

38. The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtor to grant the DIP Liens and Superpriority Claim; (b) permit the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Order and the DIP Facility; and (c) permit the DIP Lender to pursue appropriate remedies provided under the DIP Facility and this Order should an Event of Default occur.

39. Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this Chapter 11 Case. *See, e.g., In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N. D. Tex. July 10, 2020) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Taco Bueno Restaurants, Inc.*, No. 18-33678 (SGJ) (Bankr. N. D. Tex. Nov. 30, 2018) (same).

### IV. Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

40. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

DM_US 182783900-4.114930.0011

41.     For the reasons noted above, the Debtor has an immediate postpetition need to access the liquidity provided by the DIP Facility.  The Debtor cannot maintain the value of its estate during the pendency of this Chapter 11 Case without access to cash.  The Debtor will use cash, among other things, to fund the operation of their business, maintain business relationships with their vendors and suppliers, make payroll, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtor's going concern value for the benefit of all parties in interest, and to fund the administration of this Chapter 11 Case.  In addition to its use of cash collateral, which the Debtor is seeking authority to use by way of a separate motion, the Debtor requires additional funds to meet their operational needs.  *See* First Day Decl. ¶ 34.  The Debtor's inability to obtain additional financing would likely lead to operational funding shortfalls and the inability of the Debtor to meet its operational needs. *Id*. In short, the Debtor's ability to administer this Chapter 11 Case access to the DIP Facility is vital to preserve and maximize the value of the Debtor's estate.

42.     The Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to funding under the DIP Facility.  The Debtor requires funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay its administrative expenses, and to implement the relief requested in the Debtor's other "first day" motions.  This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

### **Request for Final Hearing**

43.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25

days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

44. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

45. The Debtor will provide notice of this motion to: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtor; (c) MUFG Union Bank, N.A., in its capacity as successor Administrative Agent under the Prepetition Credit Agreement, or any of its predecessors or successors; (d) counsel to the proposed DIP Lender; (e) the United States Attorney's Office for the Northern District of Texas; (f) the Internal Revenue Service; (g) the state attorneys general for all states in which the Debtor conducts business; (h) any creditor known to have filed a UCC-1 financing statement concerning the Debtor's assets as of the Petition Date; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice is needed.

## No Prior Request

46. No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an interim order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 14th day of October, 2021.

Dated:  October 14, 2021

/s/ Marcus A. Helt
Marcus A. Helt, Esq. (Texas Bar #24052187)
Jane A. Gerber, Esq. (Texas Bar #24092416)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel:     (214) 210-2821
Fax:    (972) 528-5765
Email: mhelt@mwe.com
Email: jagerber@mwe.com

*PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION*

## Certificate of Service

I certify that on October 14, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ Marcus A. Helt
Marcus A. Helt

DM_US 182783900-4.114930.0011

## **Certificate of Conference**

I certify that prior to filing the foregoing Motion, I caused copies of the proposed Interim Order and the First Day Declaration, to be sent to the trial attorney in the Office of the United States Trustee, for review and comment. I also certify that the Interim Order and all exhibits thereto were heavily negotiated with the DIP Lender and its professionals, and that, based on my communications with counsel for the DIP Lender, I believe that the DIP Lender consents to entry of the DIP Order on the terms proposed in the Motion.

*/s/ Marcus A. Helt*
Marcus A. Helt

DM_US 182783900-4.114930.0011