Frank J. Wright
Texas Bar No. 22028800
Jeffery M. Veteto
Texas Bar No. 24098548
**LAW OFFICES OF FRANK J. WRIGHT, PLLC**
2323 Ross Avenue, Suite 200
Dallas, Texas 75201
Telephone: (214) 935-9100


Glen B. Rose [*Admitted Pro Hac Vice*]
Tennessee Bar No. 10598
**BASS BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 742-6273
Facsimile: (615) 742-0464

**ATTORNEYS FOR THE METROPOLITAN
GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-42423-elm |
| | ) | |
| RED RIVER WASTE SOLUTIONS, LP, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Emergency Relief Requested** |
| | ) | |

## EMERGENCY MOTION FOR MODIFICATION OF THE AUTOMATIC STAY
## TO ENABLE NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,
## TO ENSURE TRASH IS COLLECTED

Pursuant to 11 U.S.C. §§ 105, § 362(b)(4), and 362(d), the Metropolitan Government of

Nashville and Davidson County, Tennessee ("Nashville") hereby moves this Court for an order

modifying the automatic stay to enable Nashville to take action required to ensure that its residents'

trash is collected on a timely basis. Nashville brings this motion on an emergency basis in the

interest of public health. Specifically, Nashville requests the Court to enter an order modifying the

automatic stay to allow Nashville to remove up to ten (10) curbside automated routes per day from

the Debtor's contract with Nashville and to assign those routes to another provider or take other

action to ensure that trash is timely collected on those routes. In support of this motion, Nashville submits herewith the declaration of John Honeysucker, Nashville's Assistant Director of Waste Services (the "Declaration"), and shows unto the Court the following:

## I.
## INTRODUCTION

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2. Debtor filed a voluntary petition for relief pursuant to Chapter 11 with this Court on October 14, 2021 ("Petition Date").

3. Nashville asserts that regulation of its ongoing, contractual relationship with Red River Waste Solutions, LP ("Red River" or "Debtor") for the pickup of trash is a matter within the city's police and regulatory powers and is thus exempt from the automatic stay pursuant to section 362(b)(4) of the Bankruptcy Code. *See infra,* ¶ 38, *et. seq.*. Nashville files this motion out of an abundance of caution to ensure that this Court agrees.

4. Over the past two months, Debtor's performance under its waste collection agreement with Nashville has materially and persistently failed to comply with the terms of the Debtor's contract with Nashville. Debtor is in material breach of the contract, and for the reasons set forth herein, there is no basis to believe that Debtor will be able to perform its obligations under the contract going forward. Thus, Nashville is facing an ongoing public health crisis.

5. Red River simply does not have enough operable equipment to perform the contract and is therefore persistently behind on its waste collection schedule. Several of its vehicles are constantly out of service, and the Debtor simply cannot comply with the requirements for a specified number of collection vehicles. Given Debtor's precarious financial position and admitted

2

failure to properly maintain its fleet of collection trucks, there is no reasonable basis to believe that this situation will change during the pendency of this bankruptcy.

6.     Because Debtor cannot timely perform the pickups during weekdays as required by the contract, Nashville is incurring significant extra costs in order to allow Debtor to dump collected trash on the weekends.

7.     In early December 2021, Debtor indicated to Nashville that this bankruptcy would be resolved promptly and that a plan of reorganization or sales process might even be filed before Christmas.  However, no plan has been filed, and Debtor has now filed a motion for extension of its exclusivity period for more than four months, asking that it have until June 13, 2022, to file a plan of reorganization.  Under this timetable, the effective date for any confirmed plan is unlikely to occur before late 2022.

8.     Absent a significant equity infusion or new financing (above existing proposed DIP loan) under either a plan of reorganization or a sale process, Debtor cannot assume its contract with Nashville because it lacks the capability to cure the defaults in that agreement.  In addition to having to cure monetary defaults, Debtor would have to acquire several more collection vehicles and post a bond in the amount of $7.0 million in order to cure its defaults under the agreement. Furthermore, without a plan of reorganization or sale, there is no way that Debtor could provide adequate assurance that it would be able to perform its obligations during the remainder of the contract term given its lack of performance to date.

9.     Termination of the contract at this point in time is not a preferred option for either Debtor or Nashville.  The Nashville contract is one of the largest revenue generators for the Debtor, and at this point in time, Nashville does not have a replacement vendor who could quickly assume all of the approximately 25 daily collection routes covered by the Red River contract with

Nashville, and at this time, Nashville is not interested in exercising its right to purchase Red River's equipment upon termination of the Contract. Declaration, ¶ 16. Nashville reserves, however, its right to seek termination of the Contract in full, and this motion is without prejudice to any rights that Nashville may have under it (including the purchase option), in this bankruptcy case or under any applicable law.

10.     Nashville and its residents therefore face the untenable prospect of another year of severely inadequate performance from Red River in breach of its contract with Nashville. This is not fair to Nashville and its residents, and city officials in Nashville cannot allow this situation to persist, because timely collection of trash is a matter of the utmost importance to the health and safety of the community. Declaration, ¶ 17. Despite Nashville's best efforts to resolve these issues with the Debtor, this has evolved into an emergency situation for city officials that goes beyond a simple post-petition breach of an executory contract and has now become an unabated public nuisance. *Id.*

11.     Nashville asserts that these continuing post-petition failures of performance by Red River constitute cause entitling it to a modification of the automatic stay. Specifically, Nashville requests the Court to enter an order modifying the automatic stay to allow Nashville to exercise its police and regulatory powers to remove from its contract with Red River up to ten (10) curbside automated routes per day currently covered by that contract, and to assign those routes to another provider or to take other action to ensure that trash is timely collected on those routes. If the requested relief is not granted, Nashville will face an escalating public health crisis as garbage fails to be collected in a timely manner.

**II.**
**FACTUAL BACKGROUND**

12.     For the Court's reference, the city of Nashville has a combined local government structure with Davidson County, governed by the Metro Charter. *Metro. Elec. Power Bd. v. Metro. Gov't of Nashville & Davidson Cty.*, 309 S.W.3d 474, 476 (Tenn. Ct. App. 2008).

13.     Nashville respectfully submits in support of this motion the attached Declaration.

14.     In July 2004, Nashville and the Debtor entered into a solid waste collection services agreement ("Contract").   In November 2004, the parties entered into a first amendment to the original agreement. Finally, in October 2020, the parties entered into a second amendment to the original agreement. The Contract and the amendments thereto are attached to the Declaration collectively as **Exhibit "A"**.  The Debtor listed on its schedule G an executory contract with the City of Nashville. [Dkt. No. 194 at p. 65].

15.      The problems that have arisen in Nashville were partially explained in the Debtor's first day declarations, where the Debtor's representative admitted that the company has prioritized servicing its debt rather than repairing its waste collection vehicle fleet.  [Dkt. No. 3 at p. 6, ¶ 19].

16.     Under the Contract, Red River is supposed to service a total of 125 routes per week in  Nashville.  The Contract requires that trash pickup on these routes be completed during the five weekdays between the hours of 7 a.m. and 5 p.m.

17.     Per the Contract, Second Amendment, Section 2.06(A)(2), "the number of operating collection vehicles shall be no less than 80% of the number of collection routes to be performed on each working day."  Red River has on average 25 routes per day, which means that at least 20 trucks should be in operation daily. Declaration, ¶ 4. The Contract also requires Red

River to maintain sufficient back up vehicles to ensure that the required number of vehicles is available every day even if some trucks are out of service. *See* Contract, Section 2.06A.2.

18. Red River has not met this requirement on even one day since Thanksgiving. *See* Declaration, ¶ 6. Since the Petition Date, there have been several days where Red River only had 12 collection vehicles in service, and the highest number in service on any day was 17, at least 4 fewer than the minimum number required to meet the contractual requirements and have at least 1 back up unit. *Id.*

19. The Contract also specifically requires that all Nashville collection sites be completed during the Monday to Friday work week. *See* Contract, Second Amendment, Section 2. Red River has not met this this requirement since at least Thanksgiving. Declaration, ¶ 5. At best, Red River has completed its work over the weekends, but on several occasions, the Debtor has not even been able to do that and starts the week behind, as it still has to catch up on Monday routes that should have been collected on Thursday or Friday of the prior week. Declaration, ¶ 8.

20. The failure to meet these requirements in the Contract has resulted in a persistent, material and ongoing breach of the Contract by Red River. Red River typically gets behind early in the week on its collection and stays behind for the remainder of the week. Declaration, ¶ 7. As a result, many routes are not even started on the scheduled collection day and are only started the following day. For example, as of the close of business on Friday, December 10, 2021, there were three Thursday routes that had still not been completed. *Id.* This practice has created a regularly occurring snowball effect; each day Red River attempts to play catch up while those customers expecting a trash collection at the end of the week do not get collected until the following day or days after their scheduled collection. This is unacceptable from a public health perspective and must be remedied immediately. Declaration, ¶¶ 8 and 9.

21. Leaving trash cans on the street or in alley ways for extended periods of time also creates a safety hazard, as collection containers block lines of site for pedestrians and motorists, and their presence in the public right of way can contribute to accidents. Declaration, ¶ 12.

22. Not surprisingly, the number of citizen complaints about missed collections or other issues has become material, as Red River is missing more streets or subdivisions on even those routes that it reports have been completed. Since December 1, 2021, city officials have received more than 3,600 reports of missed pickups by Red River. Declaration, ¶ 11.

23. Red River's failure to complete trash pickup within the work week as required by the Contract causes Nashville to incur extra costs in the form of overtime for its personnel and increased fees required to keep the landfill where collected trash is deposited open on the weekends. These costs will continue unless the situation changes and will ultimately be borne by the Debtor and the bankruptcy estate as an administrative expense. Declaration, ¶ 10.

24. After Thanksgiving last year, Red River's performance was dismal and reached the point that city officials had to take action. Declaration, ¶ 13. On December 16, 2021, counsel for Nashville sent to counsel for the Debtor a letter notifying Red River of its continuing defaults under the Contract. During the week ended December 17, 2021, Red River failed to complete nine routes even after working on Saturday, and the upcoming weeks contained holidays, which meant that trash had to be collected during a five-day window even including Saturday (Red River does not work on holidays). *Id.*

25. Given these circumstances, Nashville officials determined that the city needed to stop its curbside recycling program so that its recycling collection vehicles and personnel could instead cover garbage routes included in the Red River Contract. Declaration, ¶ 14. Thus, before Christmas, Nashville suspended its curbside recycling program and started covering five routes

per day for Red River. This assistance continued throughout most of January. *Id.* It cannot continue any longer because residents of Nashville are (understandably) demanding that Nashville's city operated recycling program start again in February. Significantly, even with Nashville taking over five Red River routes per day, Red River has still not been able to collect timely on its reduced number of remaining routes. *Id.*

26.     In order to resume its curbside recycling program and ensure collection of all trash on a timely basis, Nashville must find a replacement vendor that can service some of the Red River routes or take other action that will provide a means of collection on these routes. Nashville cannot find such a provider who will agree to undertake these routes on a temporary basis, given the current demand for services from these providers and the cost of mobilization in order to perform these services. Nashville has, however, located a respected vendor who will assume some routes if Nashville provides it with a contract for those routes that has a definite term. *See D*eclaration, ¶ 15.

### III.
### ARGUMENT

27.     Nashville is entitled to the relief requested in this Motion so that there are enough collection vehicles operating in order for trash to be timely collected and public health and safety preserved. Debtor simply does not have the capability of performing in full its obligations under the Contract. The Nashville officials charged with responsibility for the collection of trash believe that implementation of the remedy requested herein is the only way to ensure that Nashville's trash is timely collected. Declaration, ¶ 19.

28.     Whether due to a lack of operable equipment, a shortage of personnel or some other reason, the Debtor is not fulfilling its obligations under its Contract with Nashville. As a result,

trash is not being timely collected, and the residents of Nashville are complaining regularly to city officials and their elected council members about this problem.

29.     Nashville's requested solution to this issue is simple: allow Nashville to exercise its police and regulatory powers to remove up to ten of these routes per day from the Debtor's purview in order that Nashville will have the ability to retain another provider for those routes or to take such other action it deems necessary to ensure timely collection of trash.  This will ensure trash is picked up on a timely basis, but will not preclude Red River from performing (or at least attempting to perform) on the remaining routes covered by the Contract.

30.     Nothing in section 362 of the Bankruptcy Code (or any other provision of bankruptcy jurisprudence) requires a counter-party to a contract to endure a debtor's material defaults under its agreements on an ongoing basis, post-petition.  In this case, it is no longer reasonable to expect that the Debtor will perform its duties sufficiently to avoid trash piling up in the citizens of Nashville's homes and driveways, and the residents of Nashville should not be required to suffer the consequences of these persistent failures, especially given the importance of trash pickup.  The modification of the stay sought in this motion is a fair solution for all parties, not to mention that it will keep the trash collection in the city out of range of a public health crisis.

31.     Nashville assumes for the purposes of this motion that the Debtor's executory Contract with Nashville is property of the estate.  2 NORTON BANKR. L. & PRAC. 3D § 46:8.

## A.     Relief from Stay is Warranted under Section 362(d)

32.     Nashville requests relief from the automatic stay under 11 U.S.C. § 362(d)(1). "Cause" is a flexible term in the Fifth Circuit and elsewhere, *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Mantachie Apartment Homes, LLC*, 488 B.R. 325, 331

(Bankr. N.D. Miss. 2013) but cause clearly exists here because the residents of Nashville need and are entitled to have their trash picked up on a timely basis.

33.    The automatic stay was designed to give an honest debtor breathing room, not impact public health and welfare, or defeat an entire city's sanitation imperatives on an on-going basis for months after a bankruptcy case has been filed.  *See, e.g.*, *In re Riffin*, No. 10-11248-DK, 2010 WL 3260131, at *3 (Bankr. D. Md. Aug. 18, 2010), *subsequently aff'd sub nom. Riffin v. Friedman*, 446 F. App'x 614 (4th Cir. 2011) ("The water course adjacent to the Properties and the Debtor's grading and defoliation is a source of water for Baltimore City and surrounding areas of counties connected to the city's public water system. There are other property owners downstream of the Properties that may be adversely affected by the channeling of storm water caused by the Debtor's unauthorized actions. Resolution of this public safety and environmental issue should not be further delayed by the Automatic Stay in this case.") (granting relief); *In re Pink Moon Enterprises, LLC*, 444 B.R. 490, 491 (Bankr. S.D. Fla. 2011) ("The only evidence presented at the March 24th hearing was that the present condition of the leased premises poses a threat to public safety because, *inter alia,* there is no power, emergency lighting is inoperative, lack of air conditioning poses imminent threat of mold, etc. The movant accordingly argued that its certificate of occupancy faces possible suspension or revocation.") (same).  These cases addressed emergent situations that impacted basic public health and sanitation issues.  Nashville faces a similar situation.

34.    In addition, post-petition defaults can constitute independent cause for modifying the automatic stay. *In re Karfakis*, 162 B.R. 719, 727 (Bankr. E.D. Pa. 1993) ("As additional 'cause' for modification of the Automatic Stay, Dunkin' Donuts has underscored the failure of the Debtor to make all current post-petition payments. The Court agrees that in certain circumstances

this may constitute grounds for modification of the automatic stay.") (but denying stay relief); *In re Asheville Bldg. Assocs.*, 93 B.R. 913, 917 (Bankr. W.D.N.C. 1988) (history of post-petition defaults in payment by debtor and neglect of property meant building could lose its occupancy permit; cause existed as alternative or cumulative basis for granting stay relief; *Matter of Joyner*, 55 B.R. 242, 245–46 (Bankr. M.D. Ga. 1985) (contract violations and debtor's languishing in bankruptcy for nineteen months warranted lifting of stay).

35.     In this case, Debtor simply does not have the resources available to acquire the several additional vehicles that would be required in order to comply with and perform under the Contract. Thus, unless Nashville is permitted to exercise its regulatory power to modify the Contract, there is almost no possibility that the Debtor will be able to timely collect trash as required by the Contract, and Nashville and its residents will have to endure daily breaches of the Contract by Red River.  *Cf. Matter of GP Exp. Airlines, Inc.*, 200 B.R. 222, 233 (Bankr. D. Neb. 1996) ("For example, GP Express has failed to meet performance standards relating to the completion of flights, the timely arrival of flights, and the utilization of Airline Clearing House accounting services. These breaches are historical and, by definition, cannot be cured.").

36.     Cause clearly exists to modify the stay to permit Nashville to ensure that its citizens' solid waste is picked up in a timely manner.  When a party seeks relief from the automatic stay under Section 362(d), the bankruptcy court has broad discretion to fashion an appropriate remedy. The statute itself is illustrative, offering examples that demonstrate the extent of the power granted. 11 U.S.C. § 362(d) ("[T]he court shall grant relief from the stay provided under subsection (a) of this section, *such as by* terminating, annulling, modifying, or conditioning such stay…") (emphasis added). Different situations may call for partial or even retroactive relief. *See Matter of Mendoza*, 111 F.3d 1264, 1270 (5th Cir. 1997) ("Because of the equitable nature of bankruptcy in

seeking a balance between debtors and creditors, bankruptcy courts should be afforded the latitude to fashion remedies they consider appropriate under the circumstances[.]"); *In re Schwartz*, 954 F.2d 569, 572 (9th Cir. 1992) ("Thus, section 362 gives the bankruptcy court wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay."); *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) ("The Bankruptcy Code gives the court broad discretion to provide appropriate relief from the automatic stay as may fit the facts of a particular case."); *In re Chari*, 262 B.R. 734, 736 (Bankr. S.D. Ohio 2001) ("The Bankruptcy Code provides bankruptcy courts with wide latitude to fashion relief from the automatic stay for deserving creditors who would be uniquely harmed by the stay's limitations."); *In re Atl. Ambulance Assocs., Inc.*, 166 B.R. 613, 615 (Bankr. E.D. Va. 1994) ("[A]lthough § 362(d) authorizes the court to either terminate or annul the stay, the statute otherwise provides no guidance to the remedy to be allowed. It is nevertheless apparent that the code gives the court a fairly broad discretion to provide appropriate relief from the stay as may fit the facts of the case.").

37.     The relief requested in the motion is reasonable and justified.  Nashville's request to take control of up to ten of its routes per day is appropriate and narrowly tailored to ameliorate the situation.  Red River has consistently been short by four or more of the 20 collection trucks required to perform its obligations appropriately. Declaration, ¶ 6.  It certainly does not have any back up vehicles on standby, as required by the Contract. Given Red River's open acknowledgement that it is behind on deferred maintenance of its fleet and given that the operable trucks must be used more to cover all of the routes with fewer trucks, the situation with its trucks is much more likely to deteriorate instead of improving during the course of this bankruptcy case, which is going to last for many more months.  Giving Nashville control over some of the Debtor's

routes is required in order to protect the public health of Nashville's residents and to minimize accumulating damages owed by Red River for breach of its post-petition obligations under the Contract. "Resolution of this public safety and environmental issue should not be further delayed by the Automatic Stay in this case." *In re Riffin*, No. 10-11248-DK, 2010 WL 3260131, at *3.

**B.**     <u>Section 362(b)(4) Supplies Further Support for Modifying the Stay</u>

38.     11 U.S.C. § 362(b)(4) excepts from the automatic stay an action "to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power." This Section represents a discrete effort by Congress to carve out traditional municipal police powers from the automatic stay. *See generally In re First All. Mortg. Co.*, 263 B.R. 99, 106–07 (B.A.P. 9th Cir. 2001) (discussing the legislative history and noting the two tests, pecuniary purpose and public policy, to determine whether the government's actions should be exempt from the stay).

39.     Municipal waste collection is a clear example of the police power. 7 McQuillin Mun. Corp. § 24:242 (3d ed.) ("Municipal collection and disposal of waste products or municipal supervision and regulation of private performance of these functions are within the police power. Quite obviously, the expeditious removal and disposal of waste substances are essential to protect against health menaces, danger of fire, and offensive and unwholesome smells. Accordingly, municipal corporations ordinarily have power to remove decaying dead animals, garbage, offal, rubbish, trash, and other waste or to direct the manner of removal of such substances."); *see also id.* § 24:247.

40.     The Supreme Court has echoed this concept. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007) ("The Counties' ordinances are

exercises of the police power in an effort to address waste disposal, a typical and traditional concern of local government."); *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 112–13 (1994) ("As far back as the turn of the century, the Court recognized that control over the collection and disposal of solid waste was a legitimate, nonarbitrary exercise of police powers to protect health and safety.") (Rehnquist, J., dissenting).

41. Nashville has not yet filed a public nuisance action against the Debtor in this case, but is seriously considering all of its legal options to abate the nuisance that is building due to the Debtor's failure to perform. Where one isolated failure to pick up trash might be a simple post-petition breach of contract, the scope of this problem is becoming a health hazard. *Cf. In re D'Mello*, 473 B.R. 207, 210 (Bankr. E.D. Mich. 2011) ("The Township's actions in obtaining and trying to enforce the January 12 order against D'Mello clearly are an exercise of the Township's 'police and regulatory power' within the meaning of § 362(b)(4). This exception to the automatic stay clearly applies to enforcement of the January 12 order against D'Mello, through contempt proceedings which may include incarceration, to the extent that the actions the Township seeks to compel do not require D'Mello to spend or pay money to accomplish the actions.") (township's attempt to enforce court order against debtor to abate public nuisances including blight, garbage, and rubbish). *See also In re Phillips*, 368 B.R. 733, 741 (Bankr. N.D. Ind. 2007) ("The City's purpose in issuing the ordinance violations was to remove all materials—garbage, trash, waste water, rubbish, waste, appliances, furniture in the yard—detrimental to public health. The fines issued to the debtor were not money judgments; they were the costs of reimbursing the City for the clean-up work (such as clearing garbage) and safety repairs (such as boarding up a window and door).") (finding for city); *United States v. NCR Corp.*, No. 10-C-910, 2012 WL 6042222, at *1 (E.D. Wis. Jan. 25, 2012) (concluding the stay did not apply in CERCLA action). Because

trash collection is a clear exercise of the police power, any action by Nashville to abate the nuisance caused by the Debtor would likely be insulated by Section 362(b)(4).

## IV.
## CONCLUSION

42.    Debtor's continuing failure to meet the performance and equipment requirements of its Contract are material breaches of the Contract, and Debtor's ongoing breaches of the Contract are negatively impacting the health and safety of the residents of Nashville. Also, even if the time has not yet arrived for Nashville to invoke Section 362(b)(4) as to a specific enforcement action pending in Tennessee (via ordinance, injunction to abate a public nuisance, or otherwise), the plain Congressional intent of that section supports the Bankruptcy Court's exercise of its discretion in finding that cause exists to modify the automatic stay to allow Nashville to take action required to abate the problems resulting from Debtor's ongoing breaches of the Contract.

**WHEREFORE, PREMISES CONSIDERED**, Nashville prays for the Court to grant the following relief:

1.    to enter an Order modifying the automatic stay imposed by 11 U.S.C. § 362 to allow Nashville to reassign up to ten routes per day currently serviced by the Debtor to another provider or to allow Nashville to collect trash on these routes using its own equipment or through other actions designed to insure timely collection of trash on those routes;

2.    to waive the requirements of Bankruptcy Rules 4001(a)(3), 6004(a) and 6004(h), thereby giving full force and effect to the Order upon entry by the Court; and

3.    to grant such other and further relief as the Court deems just and appropriate.

DATED: January 27, 2022

Respectfully submitted,

LAW OFFICES OF FRANK J. WRIGHT, PLLC

By:     */s/ Frank J. Wright*
        Frank J. Wright
        Texas Bar No. 22028800
        Jeffery M. Veteto
        Texas Bar No. 24098548

2323 Ross Avenue, Suite 200
Dallas, Texas 75201
Telephone:   (214) 935-9100
Emails:       frank@fjwright.law
             jeff@fjwright.law

-and-

BASS BERRY & SIMS PLC

By:     */s/ Glenn B. Rose*
        Glenn B. Rose [*Admitted Pro Hac Vice*]
        Tennessee Bar No. 10598

150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone:   (615) 742-6273
Facsimile:   (615) 742-0464
Email:         grose@bassberry.com

**ATTORNEYS FOR THE METROPOLITAN
GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned certifies that I conferred via email with Marcus Helt and Jane Gerber, counsel for the Debtor, concerning the relief sought herein over the last week, and via telephone with Marcus Helt concerning the same. We were unable to resolve this matter without necessity of Court intervention.

        */s/ Glenn B. Rose*
        Glenn B. Rose

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2022, a true and correct copy of the foregoing *Emergency Motion for Modification of the Automatic Stay to Enable Nashville and Davidson County, Tennessee, to Ensure Trash is Collected* was served by First Class U.S. Mail on the parties listed below, and via the Court's *ECF system* for the Northern District of Texas on all parties accepting electronic service.

Red River Waste Solutions, LP, *Debtor*
4004 East Hwy 290 West
Dripping Springs, TX 78620

Marcus Helt, *Debtor's Counsel*
McDermott Will & Emergy LLP
2501 North Harwood St., Ste. 1900
Dallas, TX 75201

Office of the United States Trustee
Attn: Erin Schmidt
1100 Commerce St., Room 976
Dallas, TX 75202

Official Committee of Unsecured Creditors
c/o Matthew P. Ward
Womble Bond Dickinson (US) LLP
1212 North Market St., Ste. 1200
Wilmington, DE 19801

Official Committee of Unsecured Creditors
c/o Todd A. Atkinson
Womble Bond Dickinson (US) LLP
811 Main St., Ste. 3130
Houston, TX 77002

**See also the following service list.**

 */s/ Frank J. Wright*
Frank J. Wright

32331401.1

17

**Service List**

| | | | | |
|---|---|---|---|---|
| Argonaut Insurance Company | c/o Steven M. Beauchamp | Krebs, Farley & Dry, PLLC | 909 18th St. | Plano, TX 75074 |
| City of Fort Wayne, Indiiana | c/o Vincent P. Slusher | Faegre Drinker Biddle & Reath, LLP | 1717 Main St., Ste. 5400 | Dallas, TX 75201 |
| City of Fort Wayne, Indiiana | c/o Jay Jaffe | Faegre Drinker Biddle & Reath, LLP | 600 E. 96th St., Ste. 600 | Indianapolis, IN 46420 |
| Comerica Bank | c/o J. Frasher Murphy & Jordan Elizabeth Chavez | Haynes and Boone, LLP | 2323 Victory Avenue, Ste. 700 | Dallas, TX 75219 |
| Daimler Trust | c/o Stephen G. Wilcox | Wilcox Law, PLLC | P.O. Box 201849 | Arlington, TX 76006 |
| Dripping Springs Independent School District | c/o John T. Banks | Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | 3301 Northland Dr., Ste. 505 | Austin, TX 78731 |
| Euclid Investments Fudning I LLC | c/o E. P. Keiffer | Rochelle McCullough, LLP | 325 North St. Paul St., Ste. 4500 | Dallas, TX 75201 |
| Euclid Investments Fudning I LLC | c/o Howard L. Siegel | | 945 McKinney St., PMB 434 | Houston, TX 77002 |
| Huntington National Bank | c/o Susan B. Hersh | Susan B. Hersh, P.C. | 12770 Coit Rd., Ste. 850 | Dallas, TX 75251 |
| Huntington National Bank | c/o Eric E. Hull | Huntington National Bank | 1405 Xenium Lane North (PCC180) | Plymouth, MN 55441 |
| MUFG Union Bank, N.A. | c/o William A. Wood III | Bracewell LLP | 711 Louisiana St., Ste. 2300 | Houston, TX 77002 |
| Northpoint Commercial Finance LLC and LBC Capital, Inc. | c/o Kenneth A. Hill | Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan St., Ste. 1800 | Dallas, TX 75201 |
| Peoplease | c/o William L. Siegel | Cowles & Thompson, P.C. | 901 Main St., Ste. 3900 | Dallas, TX 75202 |
| Sumitomo Mitsui Finance and Leasing Co., Ltd. | c/o Matthew F. Kye | Kye Law Group, P.C. | 201 Old Country Rd., Ste. 120 | Melville, NY 11747 |
| Sumitomo Mitsui Finance and Leasing Co., Ltd. | c/o James W. King | Offerman & King, L.L.P. | 6420 Wellington Pl. | Beaumont, TX 77706 |
| SummitBridge National Investments VIII LLC | c/o Jason S. Brookner & Lydia R. Webb | Gray Reed | 1601 Elm St., Ste. 4600 | Dallas, TX 75201 |
| Texas Comptroller of Public Accounts | c/o Christopher J. Dylla | OAG, Banrkuptcy & Collections Division | P.O. Box 12548 | Austin, TX 78711 |
| The County of Hays, Texas | c/o Tara LeDay | McCreary, Veselka, Bragg & Allen, P.C. | P.O. Box 1269 | Round Rock, Texas 78680 |
| Toter, LLC | c/o John D. Cornwell | Munsch Hardt Kopf & Harr, P.C. | 700 Milam St., Ste. 2700 | Houston, TX 77002 |
| Triumph Savings Bank, SSB | c/o Michael S. Held & J. Machir Stull | Jackson Walker, L.L.P. | 2323 Ross Avenue, Ste. 600 | Dallas, TX 75201 |
| Triumph Savings Bank, SSB | c/o Dirk Copple & Tulani Ruffin | TBK Bank, SSB | 3 Park Central, Ste. 1700, 12700 Park Central Drive | Dallas, TX 75251 |
| Val Verde County | c/o Don Stecker | Linebarger Goggan Blair & Sampson, LLP | 112 E. Pecan St., Ste. 2200 | San Antonio, TX 78205 |
| VFS Leasing Co. | c/o Andrew G. Edson & Audrey L. Hornisher | Clark Hill PLC | 901 Main St., Ste. 6000 | Dallas, TX 75202 |
| XL Specialty Insurance Company, Greenwich Insurance Company, and Indian Harbor Insurance Company | c/o Timothy W. Brink | Meltzer, Purtill & Stelle LLC | 300 South Wacker Dr., Ste. 2300 | Chicago, IL 60606 |
| XL Specialty Insurance Company, Greenwich Insurance Company, and Indian Harbor Insurance Company | c/o Joseph F. Postnikoff & Kevin G. Herd | Law Offices of Joseph F. Postnikoff, PLLC | 777 Main St., Ste. 600 | Fort Worth, TX 76102 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-42423-elm |
| | ) | |
| RED RIVER WASTE SOLUTIONS, LP, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Emergency Relief Requested** |
| | ) | |

## DECLARATION OF JOHN HONEYSUCKER IN SUPPORT OF EMERGENCY MOTION FOR MODIFICATION OF THE AUTOMATIC STAY TO ENABLE NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, TO ENSURE TRASH IS COLLECTED

I, John Honeysucker, Assistant Director of Waste Service for Metro Nashville, pursuant to 28 U.S.C. § 1746 hereby declare that the following is true to the best of my knowledge, information, and belief. I offer this Declaration in support of the *Emergency Motion for Modification of the Automatic Stay to Enable Nashville and Davidson County, Tennessee, to Ensure Trash is Collect* (the "Motion") filed by the Metropolitan Government of Nashville and Davidson County, Tennessee ("Nashville") for an order modifying the automatic stay to enable Nashville to exercise its police and regulatory power by taking action required to ensure that its residents' trash is collected on a timely basis.

1.      I am Metro Nashville's Assistant Director of Waste Services. I am responsible for overseeing Red River Waster Solutions, LP's ("Red River" or "Debtor") performance of its obligations to collect the trash in Nashville.

2.      I am familiar with the terms of Nashville's Contract with Red River. The Contract attached hereto as **Exhibit A** is a true and correct copy.[1]

---

[1]    All capitalized terms in this Declaration not otherwise defined shall have the meanings ascribed to them in the Motion.

1

3.      Under the Contract, Red River is supposed to service a total of approximately 125 routes per week in Metro Nashville.  Red River is supposed to accomplish this by collecting approximately 25 routes per week day.  Per the Contract, these collections are to be completed between the hours of 7 a.m. and 5 p.m.

4.      Per the Second Amendment to the Contract, Section 2.06(A)(2) provides that "the number of operating collection vehicles shall be no less than 80% of the number of collection routes to be performed on each working day."  Red River has on average 25 routes per day, which means that at least 20 automated trucks should be in operation daily.  The Contract also requires Red River to maintain sufficient back up vehicles to ensure that the required number of vehicles is available every day even if some trucks are out of service. *See* Contract, Section 2.06A.2.

5.      I and other city officials receive an email each day indicating the number of Red River collection vehicles in service and available as backup that day and reporting on the status of daily collection as of 3:30 p.m.  For the last few months, since Red River is never close to completion of its routes by this time, I also receive emails late in the evening indicating the final status of Red River's collection efforts for that day.   Based on this and my knowledge of the time required to perform collection on a route, I know Red River has repeatedly collected outside of authorized hours, collecting late into the night, which in itself is a violation of the Contract.

6.      More significantly, Red River has not had in service the required number of collection vehicles on even one day since Thanksgiving. Since the Petition Date, there have been several days where Red River only had 12 collection vehicles in service, and the highest number in service on any day was 17, at least 4 fewer than the minimum number required to meet the contractual requirements and have at least 1 back up unit. On most days during this period, Debtor has operated with only 14 or 15 automated vehicles and had no backups available.

7.     The vehicle deficit is greatly impacting daily collections and has resulted in a persistent, material and ongoing breach of the Contract by Red River. As noted, the Contract requires that all routes for the week be completed by 5:00 p.m. each Friday. Red River has not met this requirement a single time since Thanksgiving. Red River typically gets behind early in the week on its collection and stays behind for the remainder of the week. As a result, many routes are not even started on the scheduled collection day and are only started the following day or the day after that. For example, as of the close of business on Friday, December 10, 2021, there were three Thursday routes that had still not been completed.

8.     At best, Debtor is only able to complete the routes by working on the weekends (which is itself a breach of the Contract), but there have been occasions in both December 2021 and this month where Red River has not even been able to do that and starts the week behind, as it still has to catch up on Monday routes that should have been collected on Thursday or Friday of the prior week. In my opinion, this is unacceptable from a public health perspective and must be remedied immediately.

9.     These repeated performance failures by Red River have created a regularly occurring snowball effect; each day Red River attempts to play catch up while those customers expecting a trash collection at the end of the week do not get collected until the following day or days after their scheduled collection. This also means that trash pickup for residents is extremely irregular, and that trash is sitting outside for unpredictable amounts of time.

10.     Because Debtor cannot timely perform the pickups required under the Contract during weekdays, Metro is incurring significant extra costs in order to allow Debtor to dump collected trash on the weekends that it should have been collecting on weekdays. Red River's failure to complete trash pickup within the work week as required by the Contract causes Nashville

3

to incur extra costs in the form of overtime for its personnel and increased fees required to keep the landfill where collected trash is deposited open on the weekends. These costs will continue unless the situation changes and will ultimately be borne by the Debtor and the bankruptcy estate.

11. As part of my responsibilities, I also oversee complaints received about the service provided by Red River. My department receives numerous complaints regarding Red River's performance. Most of these complaints are reported through Red River, but my department also receives complaints directly from residents and through Metro council members who have heard from their constituents. The number of citizen complaints about missed collections or other issues has become material. A spreadsheet reflecting these complaints is maintained, and it reflects more than 3,600 missed pickups since November 1 of last year. I am also aware of situations where the Debtor has reported that routes had been completed when, in fact, entire subdivisions included in the "completed" route have been missed. Based on these reports, I know that Red River is not doing a good job even on those routes that its reports to my department as having been completed.

12. Red River's failure to perform in accordance with the Contract creates other issues as well. For example, leaving trash cans on the street or in alley ways for extended periods of time creates a safety hazard, as collection containers block lines of site for pedestrians and motorists, and their presence in the public right of way can contribute to accidents. Additionally, there are increased risks of pests and rodents infiltrating the waste receptacles if they are left in the street or alley for an extended period.

13. In December 2021, Red River's dismal performance reached the point that I and others city officials determined that we had to take action. During the week ended December 17, 2021, Red River failed to complete nine routes even after working on Saturday, and the upcoming

weeks contained holidays, which meant that trash had to be collected during a five day window even including Saturday (Red River does not work on holidays).

14.     Given these circumstances, I and other Nashville officials determined that the city needed to stop its curbside recycling program so that its recycling collection vehicles and personnel could instead cover garbage routes included in the Red River Contract. Thus, before Christmas, Nashville suspended its curbside recycling program and started covering five routes per day for Red River. This assistance continued throughout most of January. It cannot continue any longer because residents of Nashville are understandably demanding that Nashville's city operated recycling program start again in February. Significantly, even with Nashville taking over five Red River routes per day, Red River has still not been able to collect timely on its reduced number of remaining routes.

15.     In order to resume its curbside recycling program and ensure collection of all trash on a timely basis, Nashville must find a replacement vendor that can service some of the Red River routes. Nashville cannot find such a provider who will agree to undertake these routes on a temporary basis, given the current demand for services from these providers and the cost of mobilization in order to perform these services. Nashville has, however, located a respected vendor who will assume some routes if Nashville provides it with a contract for those routes that has a definite term.

16.     Termination of the Contract at this point in time is not a feasible option for Nashville. Nashville does not have a replacement vendor who could quickly assume all of the approximately 125 weekly collection routes covered by the Red River contract with Nashville, and at this time, Nashville is not interested in exercising its right to purchase Red River's equipment upon termination of the Contract. Nashville reserves, however, its right to seek termination of the

Contract in full, and this motion is without prejudice to any rights that Nashville may have under it (including the purchase option), in this bankruptcy case or under any applicable law.

17.     Unless Nashville takes action now to secure timely collection of trash, Nashville's residents face the untenable prospect of another year of severely inadequate performance from Red River in breach of the Contract. Given Debtor's precarious financial position and admitted failure to maintain properly its fleet of collection trucks, in my opinion, there is no reasonable basis to believe that this situation will change or improve during the pendency of this bankruptcy. This is not fair to Nashville and its residents, and I and other city officials in Nashville cannot allow this situation to persist, because timely collection of trash is a matter of the utmost importance to the health and safety of the community. In my opinion, Nashville faces an emergency situation that goes beyond a simple post-petition breach of the Contract and has now become an unabated public nuisance.

18.     Debtor's continuing failure to meet the requirements of the Contract are material and have a severe negative impact on the well-being of its residents. Nashville's elected officials are demanding that I and my department take appropriate action to ensure that trash (including curbside recycling) is collected timely and to ameliorate the problems arising from Red River's failure to perform. I believe their complaints are justified and it is my job to address them.

19.     The residents of Nashville should not be required to suffer the consequences of Red River's ongoing failures and breaches of the Contract, especially given the importance of trash pickup. In my opinion, the solution sought by Metro is absolutely necessary in order keep the trash collection in the city out of range of a public health crisis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2022

6

John Honeysucker,
*Assistant Director of Waste Services*

32328671.1