Marc S. Tabolsky (Texas Bar #24037576)
Andrew S. Hicks (Texas Bar #24032419)
James A. Keefe (Texas Bar #24122842)
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel: (713) 357-5150
Fax: (713) 357-5160
Email: mtabolsky@shjlawfirm.com
Email: ahicks@shjlawfirm.com
Email: jkeefe@shjlawfirm.com

*SPECIAL COUNSEL FOR THE
DEBTOR-IN-POSSESSION*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RED RIVER WASTE SOLUTIONS, LP, | ) | Case No. 21-42423 (ELM) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DEBTOR'S MOTION FOR RULE 2004 EXAMINATION

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 22, 2022, AT 2:30 PM (CT) BEFORE THE HONORABLE EDWARD L. MORRIS, IN THE ELDON B. MAHON U.S. COURTHOUSE, AND MAY BE ATTENDED REMOTELY (BY VIDEO AND TELEPHONE VIA THE COURT'S WEBEX PLATFORM) AS SET FORTH IN GENERAL ORDER 2021-06. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE (23) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**WEBEX CONNECTION INFORMATION AND INSTRUCTIONS MAY BE FOUND IN GENERAL ORDER 2021-06 AND CLERK'S NOTICE 21-05. WEBEX HEARING**

1

**INSTRUCTIONS FOR THE HONORABLE EDWARD L. MORRIS MAY BE FOUND AT THE FOLLOWING WEB ADDRESS:**

https://www.txnb.uscourts.gov/content/judge-edward-l-morris-0

**For WebEx Video Participation/Attendance:**

　　Link: https://us-courts.webex.com/meet/morris

**For WebEx Telephonic Only Participation/Attendance:**

　　Dial-in: 1.650.479.3207

　　Meeting ID: 473 581 124

All parties may access copies of the Debtor's filings on the website of the Debtor's proposed claims and noticing agent at https://cases.stretto.com/RedRiverWasteSolutions or call (855) 287-3382.

　　　　Red River Waste Solutions, LP, as the debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), requests an order authorizing the Debtor to conduct a Rule 2004 examination under the Federal Rules of Bankruptcy Procedure, and makes the following representations in support of this request:

　　　　1.　　The Debtor seeks to examine MUFG Union Bank, N.A. ("MUFG").

　　　　2.　　The scope of a Rule 2004 examination is unfettered and broad, and bankruptcy courts commonly recognize the scope as more in the nature of a fishing expedition. *In re Correa*, 589 B.R. 76, 108–09 (Bankr. N.D. Tex. 2018); *In re NE 40 Partners, Ltd. P'ship*, 440 B.R. 124, 129 (Bankr. S.D. Tex. 2010); *First Fin. Sav. Assoc. v. Kipp (In re Kipp)*, 86 B.R. 490, 491 (Bankr. W.D. Tex. 1988) (scope of examination is virtually unlimited). "Legitimate goals of Rule 2004 examinations include 'discovering assets, examining transactions, and determining whether wrongdoing has occurred.'" *In re Correa*, 589 B.R. at 109 (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)).

3. The examination in this case is needed to inquire into matters of the type described in Federal Rule of Bankruptcy Procedure 2004(b), including, without limitation, the liabilities and financial condition of the Debtor and other matters that may affect the administration of the Debtor's estate. Among the matters to be examined include: (a) the circumstances surrounding the negotiation and underwriting of the credit facility documented in the contract known as "Credit Agreement Dated as of April 1, 2020 among Red River Waste Solutions, LP, as the Borrower, the Guarantors from time to time party hereto, the Lenders from time to time party hereto, and [MUFG], as Administrative Agent" (the "Credit Facility"); (b) MUFG's pre-bankruptcy attempts to market the Debtor's assets to other customers of MUFG and potential claims or causes of action related thereto; (c) whether MUFG offered, prior to the filing of this proceeding, to provide financing to other MUFG customers to facilitate the purchase of the Debtor's assets and potential claims or causes of action related thereto; and (d) potential lender-liability claims against MUFG arising from, among other things, MUFG's fraudulent misrepresentations and tortious interference with the Debtor's business relations.

4. A recent decision rendered by Judge Jernigan makes clear that conduct like the conduct described above can establish lender-liability claims. In *Bailey Tool & Mfg. Co. v. Republic Bus. Credit, LLC (In re Bailey Tool & Mfg. Co.)*, Case No. 16–30503–SGJ–7, Adv. No. 16–03025–SGJ, 2021 WL 6101847 (Bankr. N.D. Tex. Dec. 23, 2021), the Court provided a detailed decision in which it found the lender liability under the torts of fraud (through fraudulent misrepresentations) and interference with business and contractual relations. *Id.* at *42. Here, the Debtor has information that MUFG may have engaged in conduct similar to that which gave rise to liability in *Bailey*.

5.      Beginning with the fraud analysis, the lender in *Bailey* declared a default primarily based on three debtors' (collectively, "Bailey") potential inability to collect military receivables, but the lender repeatedly created the impression in communications that Bailey was in default due to being "over-advanced." *Id.* at *45. The court found that the evidence showed Bailey was not over-advanced, and the lender concealed from Bailey (1) the reason why it was in default, (2) the status of available funds, and (3) the lender's actions with the funds (i.e., paying down inventory loans and charging fees instead of making the funds available to Bailey). *Id.* at *47. The court also found that the lender continued to misrepresent that if Bailey's CEO gave the lender his homestead equity, then Bailey would receive additional funding. *Id.* The court found that, but for these representations, Bailey (1) would not have continued forwarding account invoices for processing on the promise of continued funding when none was forthcoming and (2) would not have continued the relationship with the lender if it had known that the lender's intent was to pay down its position with everything it collected. *Id.* The court also found that the CEO would not have been manipulated into paying over his homestead equity if he knew of the lender's true intentions. *Id.*

6.      Here, Debtor is in possession of email communications establishing that MUFG had actual knowledge of the Debtor's financial struggles in the months leading up to the execution of the Credit Facility. In particular, MUFG knew that Comerica Bank denied the Debtor's request for a new "CapEx line," terminated the Debtor's revolver, and would not release the tax money set aside for a sale that occurred in March 2019. As a result, the Debtor's CEO made a capital contribution of $300,000 to the Debtor. Ex. 1 at PDF 2–3. Further, MUFG plainly stated in an email dated May 21, 2019, that it "kn[e]w historically the company has been losing money." Ex. 2 at PDF 3. Moreover, MUFG knew that the Debtor was in imminent danger of losing key customers and markets. In fact, MUFG knew that in 2019 the Debtor received a default letter from

the city of Fort Wayne, Indiana. To further entice the Debtor to enter the Credit Facility, MUFG represented that it would (a) work with the Debtor on managing the Debtor's compliance with covenants that MUFG knew were unrealistic based on prior and projected performance and (b) implement a "COVID Formula" to provide relief to the Debtor to prevent any immediate default of the covenants under the Credit Facility. However, to the Debtor's detriment, the Debtor never saw any cooperation from MUFG on (unrealistic) covenant management or any benefit from the (purported) COVID Formula, to the Debtor's detriment, and the Debtor even questions whether (a) MUFG intended to work with the Debtor on the (unrealistic) covenant management and (b) a COVID Formula even existed and even if one did exist, whether it was implemented.

7.    On information and belief, Debtor believes before Debtor filed its petition for relief, MUFG was currently marketing the Debtor's assets to its other customers who are competitors of the Debtor, and for prices far less than the appraisal value used for the Credit Facility. The Debtor also believes that MUFG is offering to finance said customers' purchase of the Debtor's assets. In light of these circumstances, it is at a minimum plausible that MUFG fraudulently induced the Debtor into entering the Credit Facility with the intent of either (a) liquidating the Debtor's assets through an inevitable default based on the heavily one-sided (unrealistic) terms of the Credit Facility or (b) forcing the Debtor to sell its business at a steep discount for one or more of its other customers. Like in *Bailey*, but for the representations made by MUFG regarding the Credit Facility, the Debtor and its CEO would not have entered into the Credit Facility, especially if they knew that the Credit Facility was a veiled attack on the Debtor's business intended to aid MUFG's customers, which were/are the Debtor's competitors. Furthermore, it has come to the Debtor's attention that MUFG is currently operating under a cease-and-desist order issued by the Office of the Comptroller of the Currency for unsafe and unsound banking practices. Ex. 3. Further

5

investigation may shed light (or explain) why or whether MUFG's underwriting of the Credit Facility may have been (or was) contrary to proper banking practices.

8. Regarding tortious interference with contractual and business relations, the court noted that Bailey had valid contracts with customers and vendors for many years. *Id.* The court determined that the lender interfered with those contracts by claiming a customer should not pay Bailey, threatening the customer with litigation if it paid Bailey, and by wrongfully withholding funds from Bailey rendering it unable to fulfill orders to customers. *Id.*

9. Here, the Debtor on several occasions was on the verge of closing a deal to sell its business to other waste-management companies. Just when the deals appeared to be coming to fruition, on information and belief, MUFG intervened and spoke to (and even negotiated with) the proposed purchasers. In each case, the proposed purchaser significantly decreased its offer in subsequent letters of intent after speaking with MUFG. Additionally, it has recently come to light that at least one of the proposed purchasers is MUFG's client. In fact, that same proposed purchaser informed the Debtor that its interest in purchasing the Debtor's business greatly decreased after speaking with MUFG and its advisors.

10. An adversary proceeding in this case was filed on May 2, 2022. Adv. No. 22-04024, ECF No. 1. Generally, the "pending-proceeding" rule (like L.R. 2004-1) provides that once an adversary proceeding or contested matter has been initiated, "discovery is made pursuant to Federal Rules of Bankruptcy Procedure 7026 *et seq.*, rather than by a [Rule] 2004 examination." *In re Wash. Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (citing *In re Bennett Funding Grp., Inc.,* 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996); *In re Enron Corp.,* 281 B.R. at 840; *In re 2435 Plainfield Ave., Inc.,* 223 B.R. 440, 455–56 (Bankr. D. N.J. 1998) (collecting cases); *Intercontinental Enters., Inc. v. Keller (In re Blinder, Robinson & Co., Inc.),* 127 B.R. 267,

274 (D. Colo. 1991) (quoting *In re Valley Forge Plaza Assocs.,* 109 B.R. 669, 674–75 (Bankr. E.D. Pa. 1990)). The prohibition on the use of Rule 2004 examinations after an adversary proceeding has commenced has, however, an exception: "[d]iscovery of evidence *related* to the pending proceeding must be accomplished in accord with more restrictive provisions of [the Federal Rules of Bankruptcy Procedure], while *unrelated* discovery should not be subject to those rules because there is an adversary proceeding pending." *In re Wash. Mut., Inc.*, 408 B.R. at 51 (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. at 29) (emphasis in original).

11. Regarding the relatedness question between the requested 2004 examination and the pending adversary proceeding, *In re Wash. Mut., Inc.* is instructive on this issue. In that case, on March 20, 2009, the debtors filed a suit in the United States District Court for the District of Columbia against the FDIC, and JPMorgan Chase Bank, National Association ("JPM") filed a motion to intervene, which remained pending (the "DC Action"). 408 B.R. at 47–48. On March 24, 2009, JPM filed an adversary proceeding in the bankruptcy court naming the debtors as defendants, where JPM sought declaratory judgments regarding the ownership of various assets that JPM asserted it acquired in good faith and for value from the FDIC as a receiver for Washington Mutual Bank ("WMB") (the "JPM Adversary Action"). *Id.* at 48. On April 27, 2009, the debtors filed an adversary proceeding naming JPM as defendant in an action where the debtors sought turnover of $4 billion in cash held in demand deposit accounts in the name of the debtors at WMB at the time WMB was sold to JPM (the "Turnover Action"). *Id.* On February 16, 2009, a group of insurance companies, which held common stock of Washington Mutual Inc. ("WMI") and debt securities of WMI and WMB, brought claims against JPM alleging tortious interference with an existing contract, breach of a confidentiality agreement, and unjust enrichment (the "Texas Action"). *Id.* at 48–49.

7

12. The debtors then filed a Rule 2004 examination motion seeking production of documents and related depositions regarding four areas of investigation: (1) potential business tort claims against JPM based on the allegations in the Texas Action; (2) potential fraudulent-transfer claims against JPM arising from approximately $6.5 billion of capital contributions made by WMI to WMB since December 2007; (3) potential turnover claims against JPM related to (i) approximately $177 million owed by WMB under outstanding promissory notes held by non-debtor subsidiaries of WMI, and (ii) approximately $22.5 million in intercompany receivables owed to WMI by WMB; and (4) potential preferential-transfer claims against JPM arising from approximately $152 million transferred to WMB or third parties on behalf of WMB in the one-year period preceding the filing of the debtors' chapter 11 petitions. *Id.* at 49. JPM opposed the 2004 motion and relied upon the pending proceeding rule. *Id.*

13. The court noted that "[t]he primary concern of courts is the use of Rule 2004 examinations to circumvent the safeguards and protections of the Federal Rules of Civil Procedure." *Id.* at 51 (citing *In re Enron Corp.*, 281 B.R. at 841). Aggressive application of the pending-proceeding rule may, however, prevent legitimate Rule 2004 examinations on matters unrelated to the pending proceeding, which would interfere with the trustee or debtor-in-possession's duty to maximize estate assets. *Id.* (citing *In re Bennett Funding Grp., Inc.*, 203 B.R. at 29). Thus, where a party requests a Rule 2004 examination and an adversary proceeding is pending, "the relevant inquiry is whether the Rule 2004 examination *will* lead to discovery of evidence related to the pending proceeding or whether the requested examination seeks to discover evidence unrelated to the pending proceeding."[1] *Id.* (emphasis added).

---

[1] This Court's Local Rule 2004–1(b) appears to follow this exception, as it provides:

> If a contested matter or an adversary proceeding is pending, the adversary discovery rules (Bankruptcy Rules 7027 - 7036), not Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1,

14. Regarding the JPM Adversary Action, the court noted that the JPM Adversary Action sought declaratory judgments that JPM owned a number of disputed assets that were purchased when it acquired the assets of WMB from the FDIC. *Id.* at 52. In contrast, the debtors' Rule 2004 motion sought production of documents and depositions related to potential business tort claims, potential fraudulent transfer claims, potential turnover claims against JPM, and potential preferential transfer claims against JPM. *Id.* Ultimately, the court concluded that the 2004 motion *did not seek discovery of evidence "related" to* the JPM Adversary Action. *Id.* (emphasis added). Specifically, the court noted that the JPM Adversary Action did not seek a determination of ownership of the potential assets the debtors sought to investigate. *Id.* at 52.

15. Here, the relief sought by MUFG in its adversary is limited, focusing on whether it has a lien on any or all of the settlement payments related to a Mutual Release and Settlement Agreement that was entered in or around December 2021. Adv. No. 22-04024, ECF No. 1, ¶¶ 21–26. Specifically, MUFG alleges that the "Ft. Wayne" settlement payments fall under "Accounts and General Intangibles" as defined in the MUFG Security Agreement while the Debtor denies such inclusion. *Id.* ¶¶ 40–42. The subjects of investigation under the Rule 2004 examination are unrelated to the issue in the pending adversary proceeding filed by MUFG. The Rule 2004 examination seeks information related to whether MUFG (a) fraudulently induced the Debtor into executing the Credit Facility and (b) tortiously interfered with the Debtor's business relations. These matters have no relation to determine whether MUFG's lien extends to the settlement payments, which is the only issue in the adversary proceeding. Further, MUFG may not invoke the pending-adversary rule by filing an adversary on a limited issue and using that adversary to

---

govern discovery *pertaining to* such contested matter or adversary proceeding. (Emphasis added.)

shield legitimate investigation/examination on topics that may lead to a substantial recovery to the Debtor and its stakeholders. As such, the Court should allow the Debtor to proceed with the Rule 2004 examination.

16.    The undersigned certifies that a conference was held on May 4, 2022, as required by Local Rule 2004-1(a) but no agreement could be reached; thus, the motion is presented to the Court for determination.

WHEREFORE the Debtor requests that the Court enter an order, substantially in the form attached hereto, Ex. 4, granting the relief requested in this motion and granting such other and further relief as appropriate under the circumstances.

Dated: May 12, 2022.

      */s/ Marc S. Tabolsky*
Marc S. Tabolsky, Esq. (Texas Bar #24037576)
Andrew S. Hicks, Esq. (Texas Bar #24032419)
James A. Keefe, Esq. (Texas Bar #24122842)
**Schiffer Hicks Johnson PLLC**
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel: (713) 357-5150
Fax: (713) 357-5160
Email: mtabolsky@shjlawfirm.com
Email: ahicks@shjlawfirm.com
Email: jkeefe@shjlawfirm.com

*SPECIAL COUNSEL FOR THE DEBTOR-IN-POSSESSION*

**CERTIFICATE OF CONFERENCE**

I certify that James Keefe and I conferred via telephone call with Tony Visage and Trey Wood, counsel for MUFG, regarding the relief sought in this motion as required by Local Rule 2004-1(a). No agreement could be reached, and the motion is presented to the Court for determination.

*/s/ Marc S. Tabolsky*

Marc S. Tabolsky

**CERTIFICATE OF SERVICE**

I certify that on May 12, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Marc S. Tabolsky*

Marc S. Tabolsky